20 So.2d 471

## LEE v. STATE.

### 4 Div. 335.

Supreme Court of Alabama.

Dec. 14, 1944.

Rehearing Denied Jan. 25, 1945.

W. L. Lee, of Dothan, for appellant.

Wm. N. McQueen, Acting Atty. Gen., and John O. Harris, Asst. Atty. Gen., for the State.

344

FOSTER, Justice.

Appellant was convicted of murder in the first degree for killing his father, and his punishment fixed at life imprisonment.

The trial was carefully conducted, and there was no error in any of the rulings unless the motion for a new trial should have been granted because the verdict was contrary to the great weight of the evidence to the extent that it is apparent that the jury was influenced by some improper motive or erroneous theory of the law of insanity as a defense, or unless the motion for a change of venue should have been granted.

On the latter question, we observe that there was apparently never any controversy but that he killed his father about noon without any provocation, and that his ·defense would be and was not guilty by reason of insanity.

It occurred about 1 o'clock p. m. on the porch of the home of deceased where defendant resided also, no one else being immediately present. Defendant was a single man about twenty-seven years of age. After shooting his father twice, causing him to fall, defendant beat him on the head with the butt of the gun bursting open his head, which was probably the immediate cause of his death.

The family was prominent on both the paternal and maternal side in the county, and well to do in a financial and social way. When the officers came he was in his room and has never made reference to it in any respect since then so far as the evidence shows, except as a witness on the trial when he testified that he remembered nothing about it. On account of the family's prominence information concerning the incident spread throughout the county, perhaps the State. There was never any particular resentment manifested by the public, then nor later.

There were introduced by the defendant eighty-six affidavits of residents in various parts of the Clayton Division of the county where the trial was had. They were all in substantially the same language, and to the effect that each had heard the case discussed, and that people generally think he was sane and ought to be electrocuted or sent to the penitentiary for life; and that in his opinion from such discussion defendant cannot get a fair trial, and that it would be useless to plead insanity, for they would convict him anyway. The former sheriff of the county was also of that opinion.

The State introduced affidavits of some sixty-seven residents of the Clayton Division, including the members of the grand jury when the indictment was returned and the present sheriff: all to the general effect that they were familiar with public sentiment in the county; had heard the case discussed; and on that basis, in their judgment, a fair and impartial trial could be had at Clayton. The State also introduced several witnesses who so testified in the presence of the court.

The trial was had at the October Term, 1943. The killing occurred the 5th or 6th of July, 1942. On July 20, 1942, the judge by virtue of section 428, Title 15, Code of 1940, held an investigation to determine by the verdict of a jury whether defendant was then insane. There was a formal trial and much evidence was introduced on both sides of that question. The defendant offered all that evidence on the trial of the motion for a change of venue.

The result of that determination was not introduced, and was not before the jury on the trial later. The evidence on that trial showed nothing which supported the motion for a change of venue.

■ On such a motion "facts and circumstances rendering such a [fair] trial improbable must appear. The mere belief of the party applying, or of the witnesses he is enabled to produce, that such a trial cannot be had, will not suffice." Jackson v. State, 104 Ala. 1, 16 So. 523, 524. In that case the affidavits were substantially the same as those used in the instant case. Baker v. State, 209 Ala. 142, 95 So. 467.

No sufficient showing was made by the proof in this case justifying a change of venue, and there was no error in overruling the motion.

■ The only defense supported by any evidence is that of not guilty by reason of insanity. This defense must be "clearly proved to the reasonable satisfaction of the jury," and the burden is on defendant to do so. Section 422, Title 15, Code; Boyle v. State, 229 Ala. 212, 154 So. 575. The burden so imposed was not denied by defendant, and he offered much evidence to meet that burden, and there was much offered in rebuttal by the State.

The court with detail and accuracy stated and often repeated the essential qualities of insanity as a defense in such a case, fully settled in the Parsons' Case [Parsons v. State] 81 Ala. 577, 596, 2 So. 854, 60 Am.Rep. 193. This was done in such way and manner as to leave no room for doubt in the mind of any ordinary juror what the issue was that he was to pass on. They were all carefully restated in Boyle v. State, supra.

There was no hereditary cause for insanity and none in the family of either parent, so far as the evidence shows.

Defendant had manifested certain qualities of exaggerated egotism as a young man. But he attended schools and college and was an exceptionally fine student: read much and remembered well; and held himself up as a sort of individual superior to his associates, and took himself very seriously.

There was introduced in evidence the testimony of several physicians, specialists in mental and nervous diseases, and some general practitioners: some of which related to his condition before and some after the killing. They agree substantially in their expressions of opinion, the substance of which may be gathered from that of Dr. E. D. Bondurant relating to the period from May 20th to July 22, 1941, before the killing in July 1942, as follows: "His parents stated to me that this young man had always been of high intelligence, but had been a 'little different' from other people; i. e. that as a child he was sensitive, nervous, restless, self-conscious, suspicious; that at times he thought others were 'watching him'; that he was high tempered, very determined, and willing to go to any length to carry his point and obtain what he desired; that he had been badly 'spoiled' and had come to feel that he should do as he pleased; that, as he grew older, he drank to excess on numerous occasions; became irresponsible and undependable in many matters; that while on a 'spree' he had a bad auto accident, wrecking the car his father had given him and injuring his leg so that it had to be amputated; that he resented his father's disapproval of his misbehavior and now blamed all of his trouble upon his father's unwillingness to give him money and let him do as he wished; that he had some type of mental breakdown while on a visit to Canada and spent two weeks in a hospital, being brought home by his father.

They all agreed that he was definitely a paranoiac, and that it was incurable.

There was much non-expert testimony as to his mental reactions. It was very well balanced, pro and con, but we need not repeat it here.

■ There seems to be small doubt but that he had paranoia, beginning in early life. But there was no evidence of a mental delusion that his father ever sought or intended to do him physical harm. But he was more indulgent perhaps than he should have been. There was a time when defendant was fully responsible for his criminal acts. Any change must have been gradual. When did he cease to be mentally and morally accountable, if he was not so on July 6, 1942? Or was he so on that day? Who can tell? It is our conviction that no human being has or can have accurate knowledge of the true answer to that question, and no one claims to have. Experts and laymen form and express an opinion, which is valuable evidence. But there is much other material evidence on

that issue. He was in court during the trial and testified that he had no recollection of the incident. That must have been hard for the jury to accept. He remembered intelligently all he read. He was a great reader and scholar. He discussed the current events with the two sheriffs: one thought he was insane, the other had a different opinion. It is difficult to understand how he could remember and understand the important issues of the day, political and economic, and have no recollection of killing his father. If he built an imaginary mountain of hatred and revenge against his father, he would still have remembered it as he did everything else. There was no evidence of lapse of memory in any other respect or at any other time. There is no evidence of any fear of imaginary danger from his father. He may have thought of financial gain by inheritance, since he had an idea that his father did not give him as much as he desired. The jury saw and heard him. It was for them to say whether the evidence reasonably satisfied them that his mental abnormality had reached the point where, as he says, he did not know that he was doing any such act, or that it was a moral or legal wrong; or that in doing it he was laboring under an irresistible impulse due to mental derangement.

To sustain the defense he must have labored under one or another of such conditions by reason of his abnormal mentality, and that the killing was the direct result of derangement of his mind solely. He says he knew' nothing about it. If so, then he is not justified by reason of any insane supposition by him that what he did was right and not illegal or because the impulse to do it was irresistible. The two mental attitudes are in conflict. Evidently the jury did not believe that he was unconscious of his act, and accepted the theory that his mental derangement had not reached that condition where, though he knew what he was doing, he justified himself morally and legally in doing it, or that the act was the result of an irresistibly deranged mental impulse.

The responsibility was by statute that of the jury. There was evidence to support a fair inference consistent with their verdict.

Affirmed.

All the Justices concur, except GARDNER, C. J., who dissents.