189 So.2d 564

**Ben T. MATHIS**

**v.**

**STATE of Alabama.**

**4 Div. 211.**

Supreme Court of Alabama.

July 14, 1966.

Rehearing Denied Sept. 8, 1966.

 

————◇————

Joe S. Pittman, Enterprise, and G. A. Lindsey, Elba, for appellant.

GOODWYN, Justice.

Appellant, Ben T. Mathis, was indicted in Coffee County for the offense of murder in the first degree, found guilty and sentenced to death. His appeal here is under the provisions of the automatic appeal statute. Act No. 249, appvd. June 24, 1943, Gen. Acts 1943, p. 217; 1955 Cum. Pocket Part, Code 1940, Tit. 15, § 382(1) et seq.; Recompiled Code 1958 (unofficial), Tit. 15, § 382(1) et seq.

The indictment charges, in count 1, that appellant "unlawfully and with malice aforethought killed Joseph Edward Morgan, by stabbing him with a knife." In count 2, it is charged that the killing was "by stabbing him with a sharp instrument, a better description of which is unknown to the grand jury."

Appellant was represented at his arraignment by two members of the Coffee County Bar, appointed by the court. At that time he entered pleas of "not guilty" and "not guilty by reason of insanity." The same attorneys represented him throughout his trial and on his motion for a new trial, and also represent him on this appeal.

Richmond M. Flowers, Atty. Gen., and David W. Clark, Asst. Atty. Gen., for the State.

■ Being mindful of our duty in cases of this kind, we have carefully considered all of the testimony, even though no lawful objection or exception was made thereto, and find none seriously prejudicial to the rights of appellant; nor can we say, after considering all of the testimony, that the verdict is so decidedly contrary to the great weight of the evidence as to be wrong and unjust. See: Act No. 249, § 10, supra; 1955 Cum. Pocket Part, Code 1940, Tit 15, § 382(10), supra; Recompiled Code 1958 (unofficial), Tit. 15, § 382(10), supra.

Under the evidence, the issue as to appellant's guilt was clearly for the jury's

determination. No evidence was offered in support of appellant's insanity plea.

The trial court, in its oral charge, fully expounded the applicable law, to which no exception was taken. Neither the State nor the appellant requested the giving of written charges.

Although reversible errors are charged and argued in appellant's brief, we find no merit in any of them. Nor do we find any other ground for reversal presented by the record. See: Code 1940, Tit. 15, § 389. Accordingly, the judgment is due to be affirmed.

Defendant's motion for a change of venue was denied after the taking of considerable evidence on an oral hearing before the trial court. It is argued in appellant's brief that it was error to deny the motion because

"* * * the widespread notoriety and publicity accorded the double murder of Mr. and Mrs. Mogan, who were long time and respected residents of the City of Enterprise, Alabama, by the press, radio and television in the City of Enterprise and surrounding area, created an atmosphere under which it became an impossibility for this defendant to receive a fair trial at the hands of an impartial jury."

▆▆▆ Publicity by the press, radio and television does not necessarily constitute ground for a change of venue. See: Denton v. State, 263 Ala. 311, 314–315, 82 So.2d 406; Campbell v. State, 257 Ala. 322, 324–325, 58 So.2d 623; Littlefield v. State, 36 Ala.App. 507, 510, 63 So.2d 565, cert. den. 258 Ala. 532, 63 So.2d 573. Whether a motion for a change of venue should be granted is a matter addressed to the sound discretion of the trial court. See: Cobern v. State, 273 Ala. 547, 551, 142 So.2d 869; Collins v. State, 234 Ala. 197, 199, 174 So. 296; Littlefield v. State, supra. From a consideration of the evidence taken on the hearing of the motion,

we cannot say that the trial court abused its discretion in denying the motion.

▆▆▆ The following from Campbell v. State, 257 Ala. 322, 324–325, 58 So.2d 623, supra, is equally applicable here:

"There was no error in overruling the motion for change of venue. The defendant on such a motion has the burden of showing to the reasonable satisfaction of the court that a fair and impartial trial cannot be had and an unbiased verdict cannot reasonably be expected. Godau v. State, 179 Ala. 27, 60 So. 908; Patton v. State, 246 Ala. 639, 21 So.2d 844. * * *

* * * * * *

"* * * In Godau v. State, 179 Ala. 27, 60 So. 908, 910, it was said:

"'So long as we have newspapers we may expect to have through them the report of crimes, and it is not to be unexpected that, when a homicide is committed * * * the newspapers of the community, answering the public interest, will furnish the defendant with at least some material upon which to base an application similar to the one under discussion.'

"Also in McClain v. State, 182 Ala. 67, 62 So. 241, 243, it was said:

"'We are not prepared to concede * * * that the sensational language of a newspaper reporter or special correspondent used in "writing up" such cases * * * may be safely taken as a reflection of general public sentiment; nor that it may be lightly assumed that such statements as those * * * shown are capable of permanently molding and fixing the opinions of the more intelligent classes of the people to the extinction of their sense of fair play, and the suppression of their sober second thought.'

"The mere belief of the defendant or of his witnesses that he cannot receive an impartial trial is not sufficient to entitle him to a change of venue. Patton

v. State, supra; Lee v. State, 246 Ala. 343, 20 So.2d 471; certiorari denied 325 U.S. 888, 65 S.Ct. 1576, 89 L.Ed. 2002."

The defendant moved to quash the indictment and also interposed a plea in abatement thereto. Both of these charge that the indictment was not returned by a lawfully constituted grand jury for the following reasons: That General Act No. 59, appvd. March 2, 1939, Gen. Acts 1939, p. 86, provides for the establishment of a jury commission in each of the counties in the State; that after the enactment of Act No. 59, and while it was in full force and effect Local Act. No. 572, appvd. Sept. 9, 1953, Acts 1953, Vol. II, p. 813, was enacted by the legislature; that Act No. 572 is made applicable only to Coffee County and purports to create in Coffee County a jury board in place of the jury commission provided for by General Act No. 59; that the jury board provided for by Local Act No. 572 "has maintained a jury box in the Enterprise Division of Coffee County and the names of the grand jurors as placed therein by the members of the said jury board were drawn from said jury box and subsequently became members of the grand jury" which returned the indictment against the defendant; that Act No. 572, a local law, is in conflict with Act No. 59, a general law; that, therefore, Act No. 572 is unconstitutional and void because it is violative of § 105, Constitution 1901, which provides, in pertinent part, that "no special, private or local law, except a law fixing the time of holding courts, shall be enacted in any case which is provided for by a general law."

■ This contention is not well taken. Since the local act is materially different from the general act, the local act is not violative of § 105. See: State ex rel. Jones v. Steele, 263 Ala. 16, 81 So.2d 542, and cases there cited and discussed. One material difference in the two Acts is the number of members constituting the "jury commission" (provided for by the general

act) and the "jury board" (provided for by the local act) and the manner of appointing such members.

It was not error to overrule the motion to quash; nor was it error to sustain the State's demurrer to the plea in abatement.

We see no need to recite or discuss the evidence in detail. The following should suffice for a proper disposition of the appeal:

About 12:30 A.M. on June 23, 1964, two Enterprise police officers, while on routine patrol, observed a 1964 Chevrolet automobile parked on a by-pass near Enterprise. They examined the car, got its license tag number, and noticed in it a plastic bag containing cheese, vanilla wafers and crackers, with a toy pistol on top of the bag. The ignition key was out and the car was unlocked. They then checked on the car's registration and found that the tag was issued to Mr. and Mrs. J. E. Morgan. About 1:50 A.M. a message came from Ozark asking information concerning the registration of the car. It developed that the car had been found in Ozark in the possession of a negro, who ran away after being stopped by a police officer because of improper driving. When the two Enterprise officers received the message from Ozark, they advised Ozark to hold the car, that it was stolen. Then they got in touch with a nephew of Mr. and Mrs. Morgan, who accompanied them to the Morgan home. Upon arrival, they found Mr. and Mrs. Morgan dead on the floor. Mr. Morgan had been stabbed with a sharp instrument 111 times.

On June 25 a deputy sheriff found a convict-type shirt near where the Morgans' car was observed on the by-pass early on the morning of June 23. This shirt was identified as one having been issued to Mathis, who had escaped from the Camp Enterprise Convict Road Camp on the night of June 20, or 21, and was still at large on the night of June 22–23.

The Morgan home was approximately a mile and a half from the convict camp.

Mr. Morgan's son testified that he last saw his father alive the Sunday afternoon before he died on Monday; that he was in his father's home over that weekend; that the coat and pants introduced in evidence as State's exhibits 3 and 4 belonged to him; and that he last saw these in his father's home on the Saturday afternoon before his father died. Mathis was wearing these two articles when he was apprehended in Ozark on July 4, 1964, at about 9:30 P.M., and then taken to the Ozark City jail. At the jail, the coat was taken off of Mathis "to identify him by the scars on his body." It was stipulated that the shoes, socks and underwear, being worn by Mathis when he was brought to the jail, were removed from him and sent to the State taxicologist for examination.

The evidence shows that no blood was found on the items of clothing; that the many wounds inflicted on Mr. Morgan's body were of the type that bleed slowly; and that due to the rain in the area during the period of about two weeks when Mathis was moving about the countryside, or due to plain wear during such period, any blood could have worn off.

At about 11:00 P.M. on July 4, the sheriff (Tillman) of Coffee County, together with a member (Sgt. Riddle) of the Highway Patrol and a State investigator (Gatlin), took Mathis from the Ozark jail for the purpose of moving him to Kilby Prison for his own safety. "There was a good many automobiles and crowd gathering at the police station." Mathis did not have on a shirt, his hands were handcuffed behind his back, and he wore leg irons. Sheriff Tillman and Riddle were on the front seat and Gatlin was seated beside Mathis on the back seat. They went by Troy on the way to Kilby. While on the way to Troy, Mathis made an inculpatory statement. There was testimony that no one offered Mathis any reward, hope of reward, or threatened him in any manner to get him to make the statement.

When the sheriff was asked what the statement was, the defendant objected and requested an examination of the witness out of the presence of the jury. This examination was held, after which the defendant's objection was overruled. The sheriff testified that Mathis "said there wasn't no use in trying to involve or get anybody else in trouble, that he did it by himself." Then followed these questions and answers:

Q. Just tell the complete statement that he made to you or in that car between Ozark and Troy, the conversation that was had with him, what was asked him and what was said?

"A. Well, we—one of us, I wouldn't say which one, one of us asked him which one he killed first and he said he killed the man first. And we asked him how he entered the house and he said he tried the window and was havinng trouble getting in there and he decided to try the back door and it come right open. And he said when he got in the back door that he fell down, that he was about drunk and he fell down. And he said that the lady said, 'That man is drunk.' And he said Mr. Morgan managed to get up and turn half around and said, 'Get out of here,' and said, 'That is when I jumped him.' And he said also that he didn't intend to kill the lady but the lady got to fighting him and he had to kill her. While he was working on Mr. Morgan the lady jumped on him and, killed both of them.

"Q. You are telling everything that was said to him and that he said on the way, was there anything said about the weapon used?

"A. Yeah, he said he got a little knife out of the kitchen, said it wasn't exactly a knife, that he had worked on it on both sides and that it was short and he sharpened it up.

"Q. Out of the kitchen, what kitchen?

"A. Out at the road camp."

The sheriff also testified that a stop was made at the Pike County Courthouse in Troy, where the circuit solicitor, Mr. Green,

questioned Mathis; that Mathis made a statement at that time; and that "no one in his presence or hearing offered Mathis any reward, hope of reward or threatened him in any way to get him to make a statement on that occasion." The defendant objected to the offering of the statement in evidence. The objection was overruled. No request was made for a voir dire examination of the witness out of the presence of the jury. The sheriff testified as follows:

"A. He said he was going to admit both of them murders, but said he wasn't going to sign nothing and then in a little bit he backed up on that, he said he didn't remember nothing, that he didn't do none of it."

Then followed the following questions and answers:

"Q. He first said he was going to admit it?

"A. Yes, sir.

"Q. And then he backed up on that and said he wasn't going to sign anything?

"A. Yes, sir.

"Q. Did you all write down anything?

"A. Mr. Gatlin started writing and he said, 'I ain't going to sign nothing.'"

Mr. Gatlin's testimony was much the same as Sheriff Tillman's. He was examined by defendant on voir dire out of the jury's presence. After the hearing, the court overruled the defendant's objection to the witness testifying concerning the inculpatory statements made by Mathis, and allowed such testimony to go to the jury. In response to a question as to what Mathis' statement was in the car on the way to Troy, the witness testified:

"A. I asked Ben Mathis if he had been alone since his escape or had anyone been with him and he said no, that he had been by himself, that he had done it, no use in trying to involve anybody else. And I asked him what he had done. He said he had killed those people at Enterprise and I asked him how he had killed

them and he said, 'Well, I stuck them and stabbed them with a knife." And I asked him how many times and he said, 'I don't know, many times, a lot of times.' And I asked him where the knife was and he said that he lost the knife, that he was running from the policeman in Ozark when he got out of the car. And I asked him which one did he kill first and he said that he killed Mr. Morgan first and then he killed Mrs. Morgan second. And I asked him aagin how many times that he stuck Mr. Morgan with a knife and he said, 'I don't know.' And he said, 'Many times,' after he said, 'I don't know,' he said, 'Many times, I don't know.'"

In response to a question as to what Mathis' statement was in the Pike County Courthouse, Mr. Gatlin testified:

"A. He stated that he killed both Mr. and Mrs. Morgan and then he got the keys to their automobile off of a table there in the den and that he took their car and he drove it to a point on the bypass between the Morgan house and the Camp Enterprise where he parked it and went out in the woods there and got his jug of julep, as he called it. And I asked him if that was some kind of intoxicating liquor and he said it was. And I asked him if he got some cookies out of the house and he said he got some cheese out of the refrigerator and some cookies out of the kitchen. And I asked him why he killed these people and he kind of shook his head and said, 'Boss, you know us old Negroes,' said, 'I was just drunk and I don't know why I did it.'"

On defendant's request, the jury was excused while the following motion was made:

"We move in behalf of this defendant that the so-called confession testimony given by the witness H. D. Tillman and witness B. J. Gatlin be excluded on the grounds that the record shows in connection with the examination of these witnesses that no opportunity was given this

defendant to seek counsel and talk to counsel—had plenty of time, the time element as shown from the uncontradicted standpoint that he had been incarcerated in the Ozark jail for some two hours or more prior to his—the so-called confessions and we also move to exclude it on the basis that they are in a narrative form and the sum and substance of them are conclusions drawn from statements—questions not shown in this record themselves and that the so-called confessions are mere conclusions of the people who are testifying in connection with it."

The motion was denied.

The defendant called as a witness a medical assistant at Kilby Prison. He testified that he examined Mathis on July 5; that Mathis said "he had been beat with a black jack by the officers that arrested him," that he asked Mathis to pull off his clothes; that he "checked him over thoroughly and the only thing he found was one little spot on the back of his head between the size of a quarter and a half-of-a-dollar which the skin was not broken and it was not bad enough to give him no medication and so I marked him up 'okay' "; and that he could feel the knot.

The defendant elected to take the stand. This was done after the court fully informed him, with his counsel present and with the jury out of the room, as to his right to take or not to take the stand. He testified that he escaped from "special confinement" at Camp Enterprise on the night of June 20 or 21. He related at length what he had done between the time of his escape and his capture on July 4. For one thing, he had some "home brew," which he drank. He denied that he killed Mr. Morgan and related in the following series of questions and answers, how he got the clothes he was wearing when captured, viz.:

"Q. All right now, you saw what, a white automobile out there, was that other automobile still there?

"A. It was still parked.

"Q. And then you saw a white automobile?

"A. Yes, sir.

"Q. All right, which way did this white automobile come from?

"A. Well, this white automobile, I couldn't tell which direction; it came from behind me. All I know is, because I was laying with my head up towards Opp. The way it come in, I was laying—

"Q. You had your head pointed away from the water tank then?

"A. Yes, sir.

"Q. And the white car came from behind in a northerly direction?

"A. Yes, sir.

"Q. Then what did you observe or what happened if anything?

"A. Well, when this car pulled up there, I discovered—I said it was two ladies. That is what I thought it was, got out of the car.

"Q. Two persons got out of the white automobile?

"A. Got out of the white automobile.

"Q. All right.

"A. The person that got out on the left hand side come around on this side on the right hand side. I thought it was two ladies. And so then—the man that got out on the left hand side he had something in his hands that looked like a long rod or something. I don't know what it was. Once it seemed like a gun or rifle or something. And so the one that got out from under the wheel reached in the back seat and got something that looked like some dresses or clothes or something on hangers and he put it on his back. And so, this here man in the front, sitting on this side, this man pulled off a dress. And I said well look here, this man is dressed up in a dress, and he rolled

his britches leg down. That is when I discovered it was a man. And so he got a grip from inside the car.

"Q. Where did he get the grip from?

"A. From the front, front floorboard; and then they get in the '57 and they pulled off, and they leave. When they leave, when I discovered they leav-·ed, I gets up and goes to this '64 Chevrolet and opens the front door.

"Q. That is the white car now?

"A. Yes.

"Q. All right.

"A. When I looked in this car I discovered that—

"Q. How far away was this car from you while this other transaction you told us about took place?

"A. Well, you know just about how far a right of way is from the highway, it was parked to the right off the highway.

"Q. And you were on the right of way?

"A. I was kind of a little off the right of way, I was kind of a little off the right of way.

"Q. You were right on the edge of the right of way then?

"A. Yes, sir.

"Q. During this entire transaction between the people in the automobile?

"A. Yes, sir.

"Q. All right, then what did you do if you did anything?

"A. Well, I crawled up to the automobile, I didn't walk up there, I crawled up there, and left my little jug of home brew out there and I crawled up to the automobile and I looks in the car and I discovered some items in the floorboard and some—

"Q. Discovered what, speak up now so everybody can hear you.

"A. I say, I—so, I opened the front door and that throwed the light on and I reached over there and the pocket of the car was open and when the pocket of the car was open I reached over there and got some handkerchiefs.

"Q. How many handkerchiefs?

"A. I don't know, about three or four; and then on the floor I discovered—right up under the pocket, I discovered a little old pair of—looked like lady's gloves. Then I discovered and paid attention that there was some cheese or looked like some light bread or something in the car. And so, by that time I had looked to see if there was a key in the car. If the key had of been in the car I would have got in the car then and cranked up and left. But the key, I didn't see any key in the switch. So a car was coming from the direction of the water tank. Then I run back out there then and got my little jug and goes up in the woods about fifty feet back up there and layed down because I think these people are coming back.

"Q. Could you see the car from where you were lying down from the road?

"A. Yes, sir.

"Q. All right, then what happened?

"A. So, this car—as I was laying down I was thinking this car was going to stop, but it slowed down and I layed there practically a few more minutes. Well, when I did get up and look—well for my best recollection—the first thing that was in my mind that it was the police because I—

"Q. Was another car stopped where the white car was now?

"A. Yes, sir.

"Q. And then in your judgment that was the police there?

"A. Yes, sir. And I layed back down.

"Q. All right, then what happened?

"A. So, I layed down there for a few minutes and tried to figure out what happened or why—what was happening. I didn't know what was happening and I was thinking was he trying to trap me or have somebody seen me over there in that pasture and said I was still in that area. And so, I said I am going to Baptist Hill now. I didn't go to the car, I went to the left of the car and come on up the road and I got there about this water thing that runs under there, and I said, well—I didn't want to have that old shirt on and so I pulled my shirt off and throwed it over there in the water—thought I throwed it in the water—and put the coat on. When I got along there I got to disturbing, and I said, well, maybe I can pull the wires on that car and wire it up. I goes back to that car, turns around in front of this tank and goes back up to the car and opens the door on the left hand side and by my scuffling from underneath, I discovered the key on the floor up under the brake.

"Q. The key was on the floorboard of that automobile?

"A. Yes.

"Q. What did you do?

"A. I didn't do nothing then but get in there and put it in neutral and crank it up and turn around.

"Q. The first time you went to the automobile over there and discovered some items, are you talking about the coat that you took?

"A. Yes, there were on a hanger, a pair of pants and a coat were on a hanger.

"Q. Did you take those items of clothing?

"A. I taken them out of there and carried them up to—when I left there to run when that car was coming from toward Baptist Hill, I taken them out.

"Q. Then down at the water hole where the culvert is is where you changed into them?

"A. I pulled off the shirt and put on the coat.

"Q. All right, then what did you do?

"A. Then I went on to Ozark. When I gets to Ozark I stopped there at this here—

"Q. How were you dressed when you got to Ozark?

"A. How was I dressed?

"Q. Yes.

"A. I had on those trousers.

"Q. Where did you put those on?

"A. I put those trousers on there, down almost to the bridge.

"Q. Speak up now, Ben, so everyone can hear you.

"A. On that new bridge that was put in down there on 27.

"Q. There is a new bridge between Ozark and Enterprise somewhere and you stopped at that bridge and changed into the trousers?

"A. I put these over them other trousers.

"Q. Over the prison trousers?

"A. Yes, sir.

"Q. All right, sir, then you went on to Ozark?

"A. Yes, sir."

Mathis also related the facts as to his arrest and subsequent events. He testified that he was thoroughly questioned and beaten, which led to his confession on the way to Troy; that he was 44 years old and had 5 years of education; that Mr. Green informed him that he was the solicitor; that

he had been convicted of the following offenses: grand larceny in 1938, 2nd degree burglary in 1946, burglary and grand larceny in 1959. The evidence also shows that he is presently serving a sentence for manslaughter. He also testified that when he left Camp Enterprise all he had "was a pair of wire pliers, spoon and safety razor"; that he was beat with a black-jack "on the head, all over the head, on my shoulder, on my back"; that only Mr. Gatlin hit him, and that the leg irons were taken off before going in the courthouse in Troy.

The following is from the solicitor's cross-examination of Mathis, viz:

"Q. Ben, in Troy, Alabama, that night, do you remember me in the room when Sheriff Tillman and Mr. Gatlin were present?

"A. Yes, sir.

"Q. Did you have your leg irons on at that time?

"A. They pulled my leg irons off after I got out of Mr. Gatlin's car and we walked upstairs in the courthouse.

"Q. Nobody was present but me, Gatlin, and Sheriff Tillman?

"A. That's right.

"Q. At that time did you not tell me, Sheriff Tillman, and Mr. Gatlin that you got the clothes, that suit there and those clothes there from a person in Ozark that you wouldn't tell us the name of?

"A. That's right, I told you that.

"Q. You didn't make any complaint to me at that time that anything like this had gone on?

"A. I didn't make a statement whatsoever because why I would not. I felt like it was my right to face a jury for this here kind of thing to go on, so I could explain my side.

"Q. I told you who I was, didn't I?

"A. That's right.

"Q. And you didn't make any complaint to me?

"A. No, sir.

\* \* \* \* \*

"Q. Ben, you got this coat off of the back porch of the Morgan house, didn't you?

"A. I got that coat from the place that I said I got it from, in the back of this car on 84, and that automobile, there is no dwelling house at all.

"Q. How come you to tell us in Troy, in my presence, to Sheriff Tillman that you got this coat in Ozark?

"A. Well, these things—from what I—

"Q. It was true what you said, wasn't it?

"A. I will explain why.

"Q. Ben, —

"A. Wait just a minute, I am going to explain it. Mr. Gatlin said there was some blood in my shirt and that some people had been killed and I know I hadn't killed no people. I haven't gone out to hurt nobody, those people haven't done nothing to me. What right—I didn't have no right to do that. I don't think that way. I haven't did what they accused me of; that's why I didn't make another statement."

The three officers in the car with Mathis denied that any of them ever hit or beat Mathis or did any physical violence whatsoever to him, nor did anyone in their presence.

On redirect examination, Young Daniel Hughes, an Enterprise policeman, testified that he made an examination of the car on the night of June 23; that the dome light came on; that he noticed the ignition key was out; that there was a little plastic bag with soda crackers, vanilla wafers and cheese in it; that

there was nothing on the floor board in the back and nothing hanging up in the car, neither clothing hanging in the car on a rack or coat hanger or window or anything. There is evidence that there were traces of cheese and crumbs in the kitchen of the Morgan home when Mr. Morgan's death was discovered. ·

From the foregoing, it is apparent that there are questions presented which should be dealt with. The principal question concerns the admission in evidence of Mathis' inculpatory statements. Incident to that question is whether it was error to deny defendant's motion to exclude "the so-called testimony given by the witness H. D. Tillman and witness B. J. Gatlin" because "no opportunity was given this defendant to seek counsel and talk to counsel."

Our conclusion is that the "confession testimony" was admitted without error and that denial of the motion to exclude such testimony was not error.

We take note of two recent decisions of the United States Supreme Court: Miranda v. Arizona (June 13, 1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and Johnson v. New Jersey (June 20, 1966), 384 U.S. 719, 86 S.Ct. 1772, 16 L. Ed.2d 882.

The holding in *Miranda* does not apply to this case. In *Johnson*, it was held that *"Miranda* applies only to cases in which the trial began after the date of our decision one week ago" (June 13, 1966, 86 S.Ct. p. 1775). The trial of this case began in 1964.

Also in Johnson it was held that Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) "affects only those cases in which the trial began after June 22, 1964, the date of that decision." The trial of the case before us began after June 22, 1964. Accordingly, *Escobedo* "affects" it.

"The rule is that extrajudicial confessions are prima facie involuntary and inadmissible and the duty rests in the first instance on the trial court to determine whether or not a confession is voluntary and unless it so appears it should not be admitted. Myhand v. State, 259 Ala. 415, 66 So.2d 544; Phillips v. State, 248 Ala. 510, 28 So. 2d 542; White v. State, 260 Ala. 328, 70 So.2d 624; Hines v. State, 260 Ala. 668, 72 So.2d 296; Goldin v. State, 271 Ala. 678, 127 So.2d 375; Smitherman v. State, 264 Ala. 120, 85 So.2d 427." Duncan v. State, 278 Ala. 145, 176 So. 2d 840, 855–856.

The record shows that, before the inculpatory statements were admitted, the State introduced evidence showing that neither threats were made nor coercive action taken against Mathis; that he was not physically threatened; and that no offer of reward or inducement of any kind was made to him to get him to make the statements. The only testimony to the contrary was that given by the defendant, and an inference from the testimony of the medical assistant from Kilby Prison. The defendant's testimony is contradictory and not at all convincing. The medical assistant testified, as already shown, that the only thing he could find was one small knot on the head and that the skin was not broken.

█ Under the evidence, a factual issue was presented on the question of voluntariness. We think the evidence is quite sufficient to support a finding of voluntariness. The statements were properly admitted in evidence.

We see no basis for reversing under the so-called "totality of circumstances" rule sometimes applied by the United State Supreme Court in holding confessions to have been improperly admitted. See: Duncan v. Sate, 278 Ala. 145, 176 So.2d 840, 864, supra, and cases there cited. No doubt, the fact that Mathis, while being transported to Kilby Prison, was handcuffed and wore leg irons seems harsh, but it must be remembered that he was an es-

caped convict, under sentence for manslaughter, who had been at large for nearly two weeks.

■ The fact that Mathis was not represented by counsel when he made the inculpatory statements did not, of itself, render the statements inadmissible. See: Lokos v. State, 278 Ala. 586, 179 So.2d 714; Sanders v. State, 278 Ala. 453, 179 So.2d 35.

There is nothing in the record indicating that Mathis, when he made the statements, either had a lawyer who was not permitted to be present, or requested a lawyer, or requested to see anyone.

In Lokos v. State, this court said:

"In Duncan v. State, supra, we followed those courts which have held that Escobedo is a controlling precedent only in those cases where the factors specified in Escobedo are present.

"Here the predicate laid by the State did not show that a lawyer was present or that appellant was advised that he was entitled to a lawyer or advised that he did not have to make a statement or as to his constitutional rights. Unlike Escobedo, the record in this case does not show that at the time the confession was made appellant had a lawyer who was not permitted to be present."

In *Lokos,* it was held that a reversal was not called for under the *Escobedo* holding.

The following from Sanders v. State, supra, is also applicable here:

"In this case the predicate laid by the State did not show that a lawyer was present at the time the confessions were made or that Sanders was advised that he was entitled to a lawyer before the confessions were made, and it was brought out on *voir dire* examination by counsel for Sanders that in fact no lawyer was present at the time the confessions were made and Sanders had not been previously advised that he was entitled to a lawyer.

"But unlike Escobedo, the record in this case does not show that at the time the confessions were made Sanders was denied an opportunity to consult with his lawyer. He did not have a lawyer and made no request for a lawyer.

"In Duncan v. State we follow those courts which had held that Escobedo is a controlling precedent only in cases where all the factors specified in Escobedo are present."

Also applicable here is the following from People v. Agar, 44 Misc.2d 396, 253 N.Y.S.2d 761, 763–764 (which was quoted approvingly in Duncan v. State, supra).

"It may well be that the conclusion of the Supreme Court of the State of California in Dorado will be the ultimate indisputable determination of the United States Supreme Court if the question reaches that court, as it is now constituted, but until there has been an appellate ruling to the contrary, *which is binding upon this Court,* I will continue to rule that, unless counsel is denied access to his client or the latter requests a counsel, a confession or a statement made by a defendant, under the circumstances here present is admissible against him, and that he need not be cautioned that he has a right to counsel nor that anything he says may be used against him." See, also: Tiner v. State, 279 Ala. 126, 182 So.2d 859; United States v. Cone (2d Cir., Nov. 22, 1965), 354 F.2d 119.

■ One other question calling for comment is whether it was error to admit in evidence the photographs of the dead body of Mr. Morgan, showing his wounds.

We hold this was not error. See: Boulden v. State, 278 Ala. 437, 179 So.2d 20; Hurst v. State, 277 Ala. 686, 174 So.2d 325; Chappelle v. State, 267 Ala. 37, 99 So.2d 431.

Finding no error to reverse, the judgment is due to be, and is, affirmed.

Affirmed.

All the Justices concur.