203 So.2d 140

**Sammie L. LOVE**

**v.**

**STATE.**

**1 Div. 175.**

Court of Appeals of Alabama.

Oct. 3, 1967.

Sydney Pfleger, Mobile, for appellant.

MacDonald Gallion, Atty. Gen. and Robt. F. Miller, Asst. Atty. Gen., for the State.

JOHNSON, Judge.

This is an appeal from a verdict of guilty and a judgment sentencing appellant to fifteen years in the State penitentiary by the Circuit Court of Mobile County, Alabama, for the offense of robbery.

The State's first witness, Earl Mothershed, an attendant at the Rebel Service Station located in Mobile County, Alabama, on the Old Shell Road, testified that at "about midnight" on August 10, 1963, while he was "sitting out front" of the service station, a 1955 Pontiac automobile "went by and blowed the horn and I waved at them"; that the automobile went on by but returned in about ten or fifteen minutes; that he later learned that the names of the occu-

pants of the car were Adolph Oliver, Billy Joe Gamble, George Alexander and appellant, Sammie Love; that appellant was the driver and that Gamble was in the front seat with him and Alexander and Oliver were in the rear; that appellant ordered fifty cents worth of gasoline which he (the witness) put into the automobile; that appellant paid for the gasoline with two quarters and asked to have his oil checked; and that while he (the witness) was checking the oil the two men in the front seat got out of the car and went behind the service station.

Mothershed stated that after he had wiped the windshield the two men got back in the car and that when he "went around to collect for the oil" appellant told him that the "one in the back would pay for it"; that when he went to the back seat to collect "Adolph Oliver put a pistol on me and told me it was a hold-up".

Mothershed testified that he told Oliver that there was no money in the station; that "all I have is on me"; that he was then ordered to get into the automobile; that he got into the back seat and sat between Alexander and Oliver; that Oliver was the only one who got out of the car during this time; that Oliver told appellant to drive and that they then left the station in the automobile with Gamble giving directions. The witness stated that each time Gamble gave a direction, appellant would turn the opposite way; that Oliver took his watch but Alexander made him return it; that finally they stopped the car and left Mothershed between two buildings on Franklin Street; and that he had given all the money to Alexander while riding in the car. The witness identified a money changer introduced into evidence as Exhibit No. 1 as belonging to him.

Mothershed stated that when the car drove away, he jumped up onto a lighted porch to see where it was going; that he saw a police car parked at a stop sign;

and that he "jumped down off the porch and run towards the police car and hollared to them"; that Officer Yates threw the spotlight on him and stopped and waited for him; that he ran and jumped into the back seat of the police car and told the officer what had happened; and that the police car "went around and turned two blocks and pulled up behind the car [in which appellant was riding] and stopped". On direct examination by the State, Mothershed stated the following:

"Q. You pointed the car out to Officer Yates?

"A. Yes sir.

"Q. Alright, and then what happened?

"A. We pulled up behind the car and stopped about two blocks away, and before the car could make a complete stop, Billy Joe Gamble jumped out of the right front and ran, and Officer Yates took off after him, and Auxillary Officer Porter held the other three at bay in front of the car.

"Q. Alright, did you stay there until the detectives got there, and the other police?

"A. Yes sir.

"Q. Were the positions of the people in the automobiles, and the positions of the cars and everything the same from the time you got there, and Porter had the three at bay, until the other Officers got there and the Detectives?

"A. Yes sir.

"Q. Nobody ramsacked the automobile or anything until the Detectives got there?

"A. No sir, there was nobody close to them.

"Q. Was this gentleman among the Detectives that came there?

"A. Yes sir.

"Q. And who was driving the car at the time it was stopped there by the police?

"A. Sammie Love.

"Q. And except for the one fellow, Billy Joe Gamble getting out and running, the positions of the people and the automobile was the same?

"A. That's right."

On cross-examination, Mothershed testified that there were open beer cans in the car and that he observed three of the men, including appellant, drinking beer. He further stated that appellant did not say anything to him while they were riding and, while on the witness stand, he identified a pistol shown to him as looking "like the one" which George Alexander held on him.

Officer Frank Yates testified that he was a Mobile City Police Officer on August 10, 1963; that he was in a scout car on this date when stopped by a man who told him he had been robbed; that the man said "there goes the car ahead of me now"; that they stopped the car shown to them; that one of the men jumped out of the car and ran; that he chased this man while his partner, Auxillary Officer Porter, held a shotgun on the other three men. On cross-examination, the witness testified that he did not search appellant but "the other officer shook him down".

Auxillary Officer Porter testified that a gun fell from the automobile which was stopped by the officers and that he picked it up. He identified this gun as State's Exhibit No. 3. On cross-examination, the officer stated that he did not search appellant, nor did anyone else search him in his presence.

Lt. Jack Clark of the Mobile Police Department testified for the State that he answered a call to go to the scene in question; that he and his partner, Detective Wilson, searched the car and found "a money changer under the front seat, and a roll of bills under the back seat." He identified the money changed, State's Exhibit No. 1, as the one found in the automobile. He stated that there were $88.00 in the roll of bills "stuffed up under the back seat" and he identified State's Exhibit No. 2 as the same bills.

Lt. Clark further stated that neither he nor anyone in his presence offered appellant any reward or hope of reward, or promise of immunity or promises of any kind to induce appellant to discuss the robbery with him; that he did not have reason to believe that appellant had committed the robbery and told appellant so; that he did not threaten, use any force, make any inducements or promises, or offer any hope of reward to induce appellant to make a statement; that appellant "freely and voluntarily" gave him a statement which, it appears from the record, was typed and witnessed by him and Detective Wilson. The witness stated that appellant did not ask to see an attorney but that he could have had an attorney if he wanted one; that he appeared to be an intelligent person and understood the questions asked and answered them in an intelligent manner; that appellant was advised of his right to not make a statement and advised that if he did make one it could be used against him. Lt. Clark identified State's Exhibit No. 4 as the statement in question and stated that it was read to appellant before he (the appellant) signed it in his presence. The statement reads as follows:

"I, Samuel L. Love, having been told that I need not make a statement do hereby make the following voluntary statement to Det. Wilson and Lt. Clark, without any fear, threat, promise of rewards or any inducements whatsoever, I have also been told that this statement may be used in a court of law.

"On or about August 10, 1963, some time around 10 pm I closed the shoe shine

parlor which I run at 658 Texas St., and at this time George Alexander, Billy Joe Gamble and Adolph Oliver asked me could they go with me as I was going over on the north side of town, we rode around and some one got to talking about robbing some place to get some money then I drove around at the direction of the other 3 in the car, I drove out Old Shell Rd. and passed the Rebel Oil Sta. in Crichton, when Adolph said that this would be a good place to get some money, Adolph had my gun in the back seat with him, I drove on down the road and came back, stopped at the station and got some gasoline and used the rest room and paid for the gas, then as we were ready to go Adolph Oliver pulled the gun on the attendant, made him get in the  back seat with Adolph and Alexander and then I drove off, as I went to the beltline hy and over to hy 90 I heard Adolph tell the attendant to give Alexander the money.  I drove around to the North side of Mobile where Adolph told me to stop and then he told the attendant to get out of the car, which he did and I drove off, South on Franklin St. and soon a Police car stopped us on Franklin near Bouregard St. and I stopped and sat in the car but Billy Joe jumped out of the front seat and ran and Alexander and Oliver tried to run but the officers stopped them, also one of the officers shot at Billy Joe as he ran."

"

/s/ Sammie L. Love.
"I have read the above statement consisting of one page and fully understand it, it is true.

"Henry L. Wilson.
"Jack Clark"

On cross-examination, Lt. Clark stated the following:

"Q.  Did he tell you who his lawyer was?
"A.  No sir.

"Q.  What did he say about the lawyer then?

"A.  I don't remember him saying anything about a lawyer except that he was going to get one.

"Q.  Did you have the impression that he knew what you was talking about?

"A.  Huh?

"Q.  Did he understand what you were talking about?

"A.  Yes, he was intelligent, he knew he could get any lawyer he wanted."

Lt. Clark also stated that appellant had been given permission to make a telephone call but was not "forced to do so" and that none of the men in the automobile which was stopped appeared to be intoxicated, nor was there any odor of alcohol detectable.

Detective Henry Wilson identified State's Exhibit No. 3 as the pistol taken by Officer Porter from appellant's automobile.  He stated that the gun contained four bullets; that he personally read appellant's statement to him and witnessed appellant's signature; and further stated, "I showed him the gun and he said that was the gun that was used in the robbery.  He identified the gun, said that was his gun, and that was the gun that was used in the robbery".

Appellant testified in his own behalf stating that he had never been convicted of a serious offense; that he operated a shoe-shine parlor on Texas Street in Mobile; that he had closed his shop at approximately 10:00 P.M. on August 10, 1963; that he had "been drinking all day" and had consumed "two pints of I. W. Harper and some beer".  He stated that he and the three other men were headed out the Old Shell Road to meet some girls; that Oliver had a history of mental illness and "is not responsible for whatever he do"; that he stopped for gas at the Rebel Oil Station and ordered $1.50 worth of gas which he paid for with small change

after coming out of the rest room; that there had been no mention of robbery when they entered the service station; that he had over $200.00 on his person; and that when he came back to the car "they had robbed the fellow". Appellant described what he saw as follows:

"Q. Tell us exactly what you saw, who was standing where, who was saying what?

"A. When I made it back from the rest room, Mr. Mothershed he was, perhaps was in my car. So Adolph Oliver throwed the gun on me and said 'get in', and i said, I asked him 'What is all this', and he said 'We done robbed the man', and I said 'Man', I says 'it doesn't make no sense to me', and so he said 'Well, it's too late now', and I said 'Oh, come on, man, let the man go', just like that, and there wasn't no way for me, because I certainly couldn't get to the policemen, not with the man with the mentally ill record.

"Q. That's the one with the gun?

"A. Adolph Oliver, yes sir.

"Q. Alright, you got in the car, is that correct?

"A. Yes sir, and I paid Mr. Mothershed for my gas, out of my pocket with my money."

Appellant testified that his reason for always taking an opposite turn from the one directed was that he was attempting "to get as close to the police station as possible"; that they had all been drinking; that Mothershed had said that only three had robbed him and that the "driver" had nothing to do with it. Appellant stated that he was never told of his right to counsel; that he had denied taking any part in the robbery in a questioning which lasted all night; and that he was forced to make a statement by being hit, and that a nurse gave him "shots"; and that he was refused the right to use the telephone.

On cross-examination appellant denied owning the pistol in question and stated that he was not in New York as contended by the state but in Albany, Georgia for three years, working.

Leon Branch, a witness for appellant, testified as to his good character and on cross-examination stated:

"Q. You know what running off means, don't you?

"A. Yes sir.

"Q. Alright, well, he did run off, and had the Sheriff and everybody else looking for him, didn't he?

"A. Yes sir, that's right."

Since this is a criminal case, this court has, as provided by Code of Alabama, 1940, Tit. 15, Sec. 389, diligently examined the entire record for errors, whether preserved by appellant or not..

■ Appellant has also stated several specific claims of error. Claim of error No. 1, that appellant was prejudiced by lack of a speedy trial, has no merit because, by appellant's own admission, he fled the State of Alabama and was absent for nearly three years following the incident, working in Georgia, until extradition by the State of Alabama. Though the record does not reflect the reasons for the time lapse from 1963 to 1965, appellant's own testimony clarifies this point.

■■ In the case of Carnley v. Cochran, 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed.2d 70, cited by appellant, failure of the court to appoint counsel for the defendant at the trial is dealt with and it is not applicable in the case at bar. Here, the trial in question, verdict and judgment were had on June 13, 1966. The case of Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882, states in part as follows:

"Escobedo and Miranda decisions decided on June 22, 1964 and on June 13, 1966 respectively, would not be applied

retroactively and respective rules laid down therein would be available only to persons whose trials began *after* the dates of the decisions and the rules would not affect cases still on direct appeal when they were decided." (Emphasis ours.)

By this specific limitation, thus Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, cited by appellant applies *after* June 13, 1966, and therefore is not applicable in the case at bar. Instead, the case of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 would be applicable had the fact situation been the same but such was not the case.

The case of Mathis v. State, 280 Ala. 16, 189 So.2d 564, states in part as follows:

"Defendant's voluntary inculpatory statements to police were admissible in trial governed by Escobedo but not by Miranda, although defendant was not represented by counsel, where it did not appear that lawyer had been excluded or that he had requested a lawyer or anyone else.

\* \* \* \* \* \*

"The fact that Mathis [he] was not represented by counsel when he made the inculpatory statements did not, of itself, render the statements inadmissible. See: Lokos v. State, 278 Ala. 586, 179 So.2d 714; Sanders v. State, 278 Ala. 453, 179 So.2d 35."

Even though there was not an affirmative ruling by the court as to the voluntariness of this confession, either in the presence of the jury or out of its presence, no evidence. to contradict the confession was introduced by appellant *before* it was admitted into evidence over appellant's objection. All testimony concerning the admission of this alleged confession was given in the presence of the jury. The case of Duncan v. State, 278 Ala. 145, 176 So.2d 840, deals with this problem by stating the following:

"We have never held that it is a requirement that the jury be excused during the time evidence is offered relating to the voluntariness of a confession, insofar as we are aware. In fact, it is very unusual to review a record where such a request has been made. Perhaps that practice has been followed in some judicial circuits, but if so we are not aware of it. Alabama has been said to follow the so-called Orthodox Rule relative to the admission of confessions. See Appendix A to Mr. Justice Black's dissent in the Jackson case, supra. However, since the so-called Orthodox Rule seems to contemplate a separate hearing before the trial judge alone on the issue of voluntariness, then we have not been strictly following that rule.

"We have often said, as heretofore shown, that prima facie confessions are involuntary and that there must be evidence addressed to the trial judge rebutting that presumption and showing prima facie that the confession was voluntarily made unless, of course, the circumstances attending the confession disclose their voluntary character. Johnson v. State, 242 Ala. 278, 5 So.2d 632. But it has not been considered by this court to be a denial of any constitutional right for the evidence to be addressed to the trial judge in the presence of the jury. It has been almost the uniform custom for such evidence to be taken in the presence of the jury, but it has been considered that the determination of the voluntariness of the confession was solely for the trial court and not for the jury. However, after the confession has been admitted the jury could consider the circumstances under which the confession was obtained, and the appliances by which it was elicited, including the situation and mutual relations of the parties in exercising their exclusive prerogative of determining the credibility of the evidence, or the weight to which it is properly entitled, in controlling the formation of a verdict, Johnson v. State, supra."

We feel that the trial court did not commit error in ruling that the con-

fession was voluntary by allowing its admission into evidence. Since there was no request on behalf of appellant to take Lt. Clark on Voir Dire or to determine the question of the voluntariness of the confession out of the presence of the jury, there was no error committed by this ruling according to the holding in Duncan v. State, supra.

All other claims of error of appellant have also been diligently considered by this court and found to have no merit.

For the reasons thus stated, the judgment in this cause is due to be and the same is hereby

Affirmed.