In September of 1982, Joseph Turner was convicted for the murder of his neighbor. His sentence was life imprisonment.
At trial, Turner entered a plea of not guilty and not guilty by reason of insanity. After a jury verdict of guilty, judgment was entered thereon. Turner filed a motion for new trial, contending proof of insanity was overwhelming and uncontroverted. That motion was denied. On appeal to the Court of Criminal Appeals, the trial court's judgment was affirmed. We granted certiorari in order to review the appellate court's decision.
 I
We begin by stating the general rules of law with respect to pleas of insanity in Alabama. These are succinctly stated by *Page 911 
Chief Justice Torbert in Christian v. State, 351 So.2d 623, 624
(Ala. 1977):
 "We begin by stating the general rule in Alabama that, as persons on trial for commission of crimes are presumed sane, the defense of insanity is an affirmative defense which must be clearly proved to the jury's reasonable satisfaction and the burden of proof in this regard rests on the defendant. Ala. Code, Tit. 15, § 422 (1958); Knight v. State, 273 Ala. 480, 142 So.2d 899 (1962); Smith v. State, 257 Ala. 47, 57 So.2d 513 (1952); Parrish v. State, 139 Ala. 16, 36 So. 1012 (1903). Thus, where a plea of not guilty by reason of insanity is filed, the burden upon the defendant is to establish the issue of legal insanity by a preponderance of the evidence. Grissom v. State, 33 Ala. App. 23, 30 So.2d 19 (1947); Lee v. State, 246 Ala. 343, 20 So.2d 471 (1944); Lide v. State, 133 Ala. 43, 31 So. 953 (1901). In this respect, the burden never shifts to the State nor rests on the State. Grammer v. State, 239 Ala. 633, 196 So. 268 (1940).
 "In applying these propositions of statutory and case law, it has been stated that the question of insanity at the time of the commission of the crime is a matter to be determined by the jury from a consideration of all the evidence. Carr v. State, 43 Ala. App. 642, 198 So.2d 791 (1967); Hawkins v. State, 267 Ala. 518, 103 So.2d 158 (1958). In making its determination, the jury may reject all expert testimony though it is without conflict. Hockenberry v. State, 246 Ala. 369, 20 So.2d 533 (1945); George v. State, 240 Ala. 632, 200 So. 602 (1941); Parrish v. State, 139 Ala. 16, 36 So. 1012 (1903). However, opinion testimony, even of experts in insanity cases, must be weighed by the jury and may not be arbitrarily ignored. Pickett v. State, 37 Ala. App. 410, 71 So.2d 102, cert. denied, 260 Ala. 699, 71 So.2d 107 (1954); Boyle v. State, 229 Ala. 212, 154 So. 575 (1934)."
In determining the issue presented by this case, we remain cognizant of these general rules regarding pleas of sanity. Further, we respect the great weight to be afforded the verdict of the jury.
 II
Because the fact that appellant shot and killed the victim is not an issue on appeal, it is unnecessary to detail the evidence here. Rather, the issue on appeal is whether the appellant, by a preponderance of the evidence, proved that, as a result of a mental disease or defect, he lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. Section13A-3-1, Code 1975. Therefore, we cite only the evidence which tends to illustrate appellant's mental state at the time the killing was done.
Eugene Edwards, who lived in the same neighborhood as the victim and the defendant, stated that he was out in the yard playing dominoes when he saw the defendant walk outside with a pistol in his hand. The defendant shot twice into the ground and said, "I will shoot anybody. I have got a right to do what I am doing." He then walked over to the victim, fired twice, reholstered his pistol and went back inside.
On cross examination, Edwards testified that he had lived near the defendant for several years and had never noticed any "strange behavior" on the defendant's part, or seen the defendant "bother" anyone. His contacts with Turner were limited to occasions when Edwards needed to borrow gas for his car from Turner.
Mr. Johnny Ruffin was watching the domino game when he heard a shot and turned to look. He saw the defendant fire two shots at the victim and then start mumbling to himself. On cross examination he said that the men in the domino game had been talking about the fact that defendant claimed to be "with the FBI or something."
Officer Ross Spurlock of the Birmingham Police Department arrived on the scene shortly after the shooting and ordered the defendant to "freeze," whereupon the defendant dropped his gun, made no attempt to escape, and surrendered to the *Page 912 
police. Spurlock said that the defendant appeared to know where and who he was and appeared to recognize the officer as a policeman.
Birmingham Police Sergeant James E. Gay interviewed the defendant after his arrest and took a statement from him at the police station. Gay testified that during the interview the defendant appeared to comprehend the questions he was asked, claimed to understand his constitutional rights, and seemed to know the difference between telling the truth and telling a lie, insisting that he was going to tell the truth. According to the officer, the defendant understood where and who he was, knew that Sergeant Gay was a police officer, and answered his questions in a forthright manner.
On cross examination, Gay conceded that some of the defendant's answers were "rambling" but concluded that he "didn't notice anything unusual from most of the people that [he] interview[ed] . . . it was just a normal interview [like he had] conducted many, many times."
The State presented no expert testimony concerning Turner's sanity.
After the State rested, the defense read into evidence the deposition of Dr. James C. Thompson, staff psychiatrist at Bryce Hospital, who stated that the defendant had been hospitalized in Bryce for approximately one year, from February of 1981 to February of 1982. Based on three interviews, the results of psychological tests, and the defendant's social history, Thompson concluded that the accused was suffering from "schizophrenia, paranoid type." The psychiatrist explained that the defendant had "pretty fixed delusions . . . that people are against him . . . specifically in this case, it was . . . a neighbor or neighbors." Dr. Thompson stated that the antipsychotic medication Haldol had been prescribed for the defendant.
When asked his opinion of the defendant's mental condition at the time of the incident in question, the physician responded as follows:
 "A. It would be hard to say exactly, but from what history we have and the fact that I didn't see him originally — but we felt like that the act of which he was charged, he was acting under a delusion at that time.
"Q. That he was acting under a delusion?
 "A. That his neighbor, I believe, was out to get him.
 "Q. So would it be your opinion that he was mentally incapable of forming an opinion as to whether or not his actions were right or wrong?
"A. Yes."
On cross examination, Thompson stated that each of his three interviews with the defendant lasted fifteen minutes and the first session took place fifteen months after the shooting. Dr. Thompson stated that "the longer it has been from the time of an incident until you interview somebody, the harder it is to look back and see what their mental state was at the time of an incident." He also stated that not everyone suffering from a mental disease or defect is unable to appreciate his criminal acts or to conform his conduct to the requirements of the law.
The defense then called Mrs. Nellie Scott, the defendant's sister, to testify to the defendant's history of mental problems. She stated that her brother was first hospitalized in the Veterans Administration facility following a series of hallucinations in 1961, but that his aberrant behavior began in 1945 after he was discharged from the service. Mrs. Scott said that after several months her brother was released from the VA hospital on the medication Thorazine. She returned him to the hospital over the years for further medication whenever he hallucinated or thought people were "after him." She testified that since 1961 her brother's mental condition had fluctuated, depending upon whether he took the medicine. As long as he had his medication he was, according to his sister, in "pretty good shape."
During June 1980, Mrs. Scott noticed that her brother's mental condition began *Page 913 
to deteriorate and she found that he did not have his medicine. She stated that during this period he had conversations with people who were not there, took notes in little books, carried a badge, and made calls to the FBI.
Mrs. Lorene Woodruff, another of the defendant's sisters, corroborated Mrs. Scott's testimony regarding her brother's history of mental problems. She testified that she had been appointed the defendant's guardian for receipt of Social Security benefits.
Ms. Donna Click, a psychiatric social worker, testified that she was employed by Jefferson County to evaluate "alleged mental patients" incarcerated in the jail. At the request of Judge Stewart and Sergeant Gay, she interviewed the defendant and determined that he was in need of further psychiatric testing. Ms. Click read the notebooks kept by the defendant and described the entries as "very bizarre." She also testified that defendant told her he was employed by the FBI or the CIA.
 III
We must note the facts in this case are strikingly similar to those presented in Christian v. State, supra, where we held that the verdict of the jury was contrary to the preponderance of the evidence. In the instant case the evidence would have authorized the jury to find that appellant was insane at the time the shooting was committed. Indeed, the evidence of appellant's insanity from both expert and lay witnesses was substantially undisputed and uncontradicted by the evidence presented by the State. The sole evidence presented by the state which can be considered contradictory is testimony by Turner's neighbor and by the police sergeant who interviewed Turner after his arrest. Both had limited contacts with Turner and both testified they had not noticed unusual or aberrant behavior by Turner in their contacts with him.
After consideration of all the testimony presented at trial, we conclude the evidence of the defendant's insanity was so strong and overwhelming that it mandated the jury find appellant was insane at the time the crime was committed. For all that appears from the record, we can find no facts which would give rise to a reasonable inference to sustain the jury's conclusion that appellant's act was that of a sane man; hence the conviction could only prevail because of the rebuttable statutory presumption of sanity. Because we consider that appellant has conclusively overcome this presumption of sanity by the great preponderance of the evidence, the jury's decision cannot stand.
The great preponderance of the evidence sustained the plea of insanity and was sufficient to rebut the State's presumption of sanity. Therefore, the judgment of the Court of Criminal Appeals is reversed and the cause remanded for judgment consistent with this opinion.
REVERSED AND REMANDED.
TORBERT, C.J., and JONES, BEATTY and ADAMS, JJ., concur.
MADDOX, FAULKNER, ALMON and SHORES, JJ., dissent.