Appellant was tried on an indictment charging him with a violation of Code 1975, § 13-5-65.[1] A jury found him guilty, and the court fixed his punishment at imprisonment for thirty years and sentenced him accordingly.
Appellant urges a fatal variance between the indictment and the proof in that the indictment charged that defendant "did wilfully and unlawfully escape from the Covington County Jail, Andalusia, Alabama, where Sheriff W.E. Harrell had him in charge under authority of law" but that the evidence showed that defendant "was being held under authority of law by a person, Jailer Melvin Watson and not Sheriff W.E. Harrell." He expressly relies upon Owens v. State, 46 Ala. App. 591,246 So.2d 478 (1971), in which it was held that there was a fatal variance between the indictment and the proof in a case based upon a violation of the same section of the Code. There the indictment charged that the alleged convict "did escape from said Camp Eight Mile," but the evidence showed that he escaped from "the custody of a prison guard while working on a road gang twelve miles from `Camp Eight Mile.'" Here the language of the indictment and the evidence were in complete agreement as to the place from which defendant allegedly escaped. The fact that Mr. Melvin Watson was the jailer and that Sheriff Harrell was not present at the jail at the time of the alleged escape, but was at home when he first learned of the jailbreak and escape of some inmates, is not repugnant to the averment in the indictment that Sheriff Harrell "had him in charge under authority of law." By authority of law, the sheriff of Covington County had custody and charge of defendant at the time of his escape.
 "The sheriff has the legal custody and charge of the jail in his county and all prisoners committed thereto, except in cases otherwise provided by law, and may appoint a jailer for whose act he is civilly responsible." Code 1975, § 14-6-1
Defendant could not have been misled by the language of the indictment as to the time, place or other material facts in the case. The proof was not at variance with the indictment.
Defendant's motion for a change of venue was overruled prior to trial. The motion was signed and verified by defendant. The claim therein that defendant could not receive a fair and impartial trial in Covington County was grounded on allegations (1) that defendant had filed a civil suit against the district attorney of Covington County Alabama and (2) that "due to the publicity surrounding the filing" of the suit, local prejudice would be such that a fair and impartial trial could not be reasonably expected. No affidavits, other than the verification by defendant, accompanied the motion, and no evidence was taken on the hearing of the motion.
It is well settled, and has been for a long time, that the burden is upon defendant to show facts entitling him to a change of venue and that his mere belief, as expressed in his motion, is not sufficient. Campbell v. State, 257 Ala. 322,58 So.2d 623; Godau v. State, 179 Ala. 27, 60 So. 908; McClain v.State, 182 Ala. 67, 62 So. 241; Mathis v. State, 280 Ala. 16,189 So.2d 564 (1966); Witherspoon v. State, Ala.Cr.App., *Page 823 356 So.2d 743 (1978). The motion for a change of venue was properly overruled.
Appellant says that the trial court committed reversible error in the refusal of each of the following charges requested in writing by defendant:
"Charge # 1.
 "If the jury should find from the evidence, that the Defendant escaped because of a threat or threats upon his life, then you may find him not guilty."
"Charge # 2.
 "If the jury should find from the evidence, that the Defendant escaped because of a threat or threats upon his life, then you must find him not guilty."
"Charge # 3.
 "If the jury should find from the evidence, that the Defendant escaped because of duress, then you may consider such duress in finding the Defendant not guilty."
There was considerable testimony by several witnesses for the State that on the night of November 1-2, 1978, there was a jailbreak of the Covington County Jail, in which seven or more prisoners escaped. One or more prisoners were seen sawing on a chain which secured the "Northside Bull Pen" field door. It seems that before an escape was effected about four or five doors in the jail came open. Defendant was seen releasing the jailer from a "Full-Nelson hold."
Defendant was seen running down a street next to the Covington County Jail.
At the time of the jailbreak defendant was confined to the jail on a conviction for burglary and grand larceny in four separate cases, with a sentence in each case of imprisonment for five years, the sentences in the last three cases to run concurrently with the first of the four cases. The defendant did not return to the Covington County Jail until he was located in the County Jail in Mindon, Nevada, and returned therefrom to Covington County.
Defendant himself was the only witness for defendant on the trial. There are some portions of his testimony, considered in isolation from his testimony as a whole, suggesting mistreatment by some of the authorities at the jail, including a refusal by them to allow him to take showers at times, abusive language, and a possible threat by one of the officers that he would shoot defendant with a pistol. All of this suggests the possibility at least of the issue of fact to the effect that in leaving the jail defendant was acting under duress or threats of death or bodily harm. However, to appellant's credit, he made it clear in his testimony (irrespective of his testimony that he had been mistreated and had been abused and threatened) that his leaving the jail was actually voluntary and not by reason of threats that had been made previous to the night of the jailbreak and that he was not actuated by duress. We quote from his testimony as follows:
"A. I seen the doors open.
"Q. All right. About what time of the night was this?
"A. It was about 1:30 in the morning.
 "Q. Okay. What happened next after you got up and saw the door open?
"A. I went out and went down stairs.
"Q. And what happened next?
 "A. I went out front and there was a police radio there and I took the microphone off the police radio.
"Q. Okay. What did you do with that microphone?
 "A. It was out in front of the County Jail, I believe. I left it out there.
 "Q. All right. Prior to this escape, had your life been threatened?
"A. Yes, sir.
 "Q. Tell the jury here who had threatened your life and then what happened and the circumstances surrounding it?
". . . .
 "A. I filed a motion while I was Court — I mean while I was in the jail over there that — uh — my car had been broken up and tires flattened by the Sheriff's Department and I wanted to take them to court. So I filed a motion in court that I didn't have any money and I was proceeding as a pauper and I had two people witnesses because they *Page 824 
wouldn't let me see a Notary Public and I sent the motion over here to the Court and instead of coming to the Court with the motion, the Court never did get to see the motion. It went to Eli Harrell [the sheriff]. So Eli Harrell and the District Attorney and two county policemen were downstairs in the office and he called me in the office and I sat down.
. . . . .
 "A. This was in the month of June. And he asked me if I thought I was smart and I told him, no, I didn't think I was smart. If I was, I wouldn't be in the County Jail. So, he jumped up and hit the desk and cussed and told them to take me out and put me some place in the jail where nobody could talk to me.
". . . .
 "A. I was taken back to the jail and I was taken to the second floor and I was locked up in a two-man cell down at the end of the jail and I went two and a half weeks without a shower.
. . . . .
 "Q. All right. Now on another subsequent occasion from the one you were just testified, tell the jury here in the Court whether or not any jailor or deputy sheriff or sheriff threatened you with a pistol or gun?
"A. Mr. Boyette.
". . . .
 "A. Mr. Boyette had a habit of playing with people down there when he first . . .
"THE COURT: Yes, just tell what happened.
"A. Mr. Boyette on a number of occasions . . .
 "THE COURT: Did he threaten your life more than one time?
"WITNESS: He threatened everybody's life.
 "THE COURT: That's immaterial. Just answer my question please?
"WITNESS: Yes, sir.
"THE COURT: Did he threaten you more than one time?
"WITNESS: Yes, sir.
 "THE COURT: All right. You can tell what happened on the occasions that he threatened you.
". . . .
 "A. He would take his pistol out and open the doors to the cell blocks and he would take his pistol out and wave it around in there at people. People would run and they would come your way and you would run to get out of the way 'cause you didn't know if the gun was gonna go off or not.
"Q. Did he say anything on these occasions?
"A. No, he just looked real mean, you know.
 "Q. You remember the last time he did this? Prior to the time that it is alleged that you escaped?
 "A. It might have been two months before that, I guess.
 "Q. Now, do you have anything else that you would like to state to the jury here concerning your escape, alleged escape with which you are charged?
 "A. Yes, sir, I don't feel that I escaped. I feel that I was aided and abetted through negligence of the Sheriff's Department for leaving that door unlocked. There is no chain in this courtroom as evidence. That's five doors that was open in the County Jail and I'm sitting here looking at a lot of time when three other people have already been tried and got ninety days for the same thing . . ."
During cross-examination of defendant as a witness the following occurred:
"Q. Was Earnest Dwight Marvin in there?
"MR. LOGGINS: We object to that, Your Honor.
"THE COURT: Yes.
 "MR. McGILL: May it please the Court, he's saying he was forced to leave out of there with the jailor waving the gun at him and I want . . .
 "MR. JACQUES: I didn't say I was chased out of nowhere with a gun . . *Page 825 
 "MR. McGILL: To show there were folks in the cell block that that same gun was waved at.
 "MR. JACQUES: I didn't say I left the jail under no condition like that at all. I said that when I was on the second floor of the jail, that the police took a gun and aimed it at me, not once but a number of times."
It can be seen from the above quotations from the record that the defendant, as a witness for himself, testified that the incident when he said that he was threatened by the sheriff, placed in another cell and not permitted to have a shower for a while, and the incident or incidents in which Mr. Boyette had handled a pistol in such a manner as to cause others in the range of the weapon to be concerned about their safety, occurred from two to five months prior to the jailbreak. Furthermore, his express disclaimer that he "left the jail under no conditions like that at all," make any and all mistreatment previous conditions, not a proximate cause. It can be seen from the quotation from defendant's testimony as a witness for himself on the trial that any and all claimed threats, express or implied, coercion or duress on the part of officers occurred between two and five months prior to the jailbreak and were so far removed therefrom that there could have been no causal relation between them and the conduct of defendant in making his escape from the jail. It appears that defendant's counsel, in his devotion to his duty as counsel, was doing all he could rightfully do to present a jury issue as to duress or the like, but that defendant's own testimony negated such theory as a defense. The court was not in error in refusing defendant's requested charges 1, 2 and 3.
Perhaps, it should be noted at this time that there has been, almost from the time the attorney representing defendant on the trial and on appeal was appointed and continuing until the present time, manifestation by defendant of dissatisfaction with such attorney and of many differences of opinion between them. This is regrettable and has, it seems, handicapped his attorney in his defense of defendant on the trial. At one time before the trial commenced, defendant moved the court to dismiss his attorney. In overruling the motion the trial court said, inter alia:
 "Mr. Jacques, I am going to deny your motion to dismiss Mr. Loggins as an attorney. Now, you do not have to accept his services. You can represent yourself if you want to. He will be available in the Courtroom. He will either try your case for you or he will advise with you about matters of law, anything that you need him to do in the defense of your case. I can't say that he will gladly do it because you have made known your desire for him not to be there. I am sure that he would rather not be there, but inasmuch as he is the second attorney that has been appointed for you, the next time the case got set for trial, you could be making another motion to get rid of that attorney because he didn't do things the way you wanted it done and one thing or another. And then, when we got it put off another time, you would be up here hollering you didn't get a speedy trial. Mr. Loggins will assist you in any way possible. He is a very competent lawyer. I know this of my own knowledge. I have seen him try many lawsuits. And I am going to deny the petition to dismiss him. In connection with being represented by him, I saw the letter your wrote to the Alabama State Bar Association. I am instructing the District Attorney right here and now in open Court not to Plea bargain with you or your attorney."
Among the reasons assigned in defendant's motion to dismiss his attorney was a claim by defendant that his attorney had spent more time in plea bargaining efforts than he should and less time than he should in preparing the case for trial.
In accordance with the trial court's statement to defendant, he permitted defendant to participate in the conduct of his defense, including making an argument to the jury. He demonstrated considerable zeal and familiarity with the facts and an *Page 826 
understanding of some of the principles of law involved, but we do not say that he acted with due deference to the court or to his attorney. It could well be that if this had been a case in which a question of defendant's guilt was evenly balanced, the scales were tilted against him chiefly by reason of a clash between him and his lawyer, which doubtless was observable by the jury, as well as by the judge. Nevertheless, the evidence was so undisputed and convincing that defendant had effected an escape in violation of statute, that he could have done nothing, that his attorney could have done nothing, and that the two working together in accord could have done nothing, to have prevented the verdict. The verdict would have been the same irrespective of the conflict between defendant and his attorney, for which the defendant was largely, if not exclusively, responsible.
We find no error in the record prejudicial to defendant, no questionable ruling of the court that, if otherwise, would have caused a different verdict. It is not for us to substitute any judgment we may have for that of the trial court as to the extent of the punishment. The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court. The judgment of the trial court is
AFFIRMED.
All the Judges concur.
[1] "Any convict who escapes or attempts to escape from the penitentiary or from any person or guard having him in charge under authority of law, either within or outside the walls of the penitentiary, before the expiration of the term for which he was sentenced, shall, on conviction, be imprisoned for an additional term of not less than one year."