[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 878 
This is an appeal from the denial of appellant's petition for a writ of error coram nobis.
The target of the petition is the judgment of conviction and sentence that was affirmed in Jacques v. State, Ala.Cr.App.,376 So.2d 821 (1979), wherein defendant was convicted of a crime of escape defined and proscribed by Code 1975, § 13-5-65, and sentenced to imprisonment for thirty years.
The petition was a pro se petition in excellent handwriting, purportedly that of the petitioner, in which the petitioner made an "Affidavit of Poverty," in which he stated that he was "unable to . . . employ an attorney." The attorney who represented him on the trial of the case and on appeal filed a motion to withdraw as attorney, which motion was granted, and a new experienced attorney was appointed to represent him, which he did on the hearing of the petition and has continued to do so on appeal.[1]
The first issue raised by appellant's attorney is as to a matter set forth in the petition, in somewhat of a discursive manner, to the effect that he was convicted of a felony and sentenced accordingly, but that the indictment charged a misdemeanor. His attorney captions the proposition:
 "Whether the judgment and sentence imposed upon the appellant was responsive to the offense charged."
The question has been a troublesome one for many years, as is evidenced by cases cited by petitioner in his petition, and it is argued by petitioner's attorney as well as it can be argued on behalf of petitioner. We agree with the following statement of appellant's counsel:
 "Alabama has [it had at the time of the alleged offense] three escape statutes material to this inquiry. Sec. 13-5-63 of the Alabama Code provides punishment for escape by a convict sentenced to imprisonment in the county jail or to hard labor for the county who escapes from such confinement before the expiration of his sentence. Sec. 13-5-65 provides punishment for any convict who escapes or attempts to escape from the penitentiary, or from any person or guard having him in charge under authority of law, either within or outside the walls of the penitentiary, before the expiration of the term for which the convict has been sentenced. Sec. 13-5-68 provides punishment of not more than six months imprisonment for any prisoner who escapes from the lawful custody of any law officer."
The issue now presented is related to, but not exactly the same as, the issue as to a material variance between the indictment and the proof that was raised and decided adversely to appellant in Jacques v. State, supra. Now it appears that appellant takes the position that the indictment does not charge a violation of § 13-5-65 but at the most charges a violation of § 13-5-68. He is mistaken, for the reason the indictment expressly charges that defendant was "a convict" and that he did wilfully and unlawfully escape from a place where a person "had him in charge under authority of law, before the expiration of the term for which he was sentenced." *Page 879 
This language is equivalent to an alternative phrase of § 13-5-65, which provides:
 "Any convict who escapes or attempts to escape from the penitentiary or from any person or guard having him in charge under authority of law, either within or outside the walls of the penitentiary, before the expiration of the term for which he was sentenced, shall, on conviction, be imprisoned for an additional term of not less than one year." (Emphasis supplied).
Some confusion could conceivably result from the failure of an indictment to set forth in the most unambiguous language possible an offense chargeable under one of the three sections as distinguished from an offense chargeable under either of the other two, but we think that it cannot be reasonably held that defendant was not sufficiently apprised of the charge against him to enable him to determine that it was based on § 13-5-65 and not under either of the other two sections. This is especially true in light of the fact that, according to the undisputed evidence, and necessarily to the knowledge of defendant, he had been convicted theretofore and sentenced to the penitentiary for burglary and grand larceny, each a felony, which could not have been embraced as a basis for an indictment pursuant to § 13-5-63. Clearly also it is not embraced as a basis for an indictment under § 13-5-68, which proscribes, according to its caption, "Escapes not otherwise provided for," which is corroborated by the text of § 13-5-68.
It is not for us to attempt to explain or justify the great difference between maximum punishment prescribed for a violation of § 13-5-65 and the maximum prescribed by § 13-5-63 and § 13-5-68. The maximum, though not expressly stated in § 13-5-65 is a "term up to and including life." Weaver v. State,44 Ala. App. 268, 207 So.2d 134 (1968); Kelly v. State,44 Ala. App. 307, 208 So.2d 217 (1968). It is to be noted that the new criminal code, Code of Alabama 1975, Title 13A, effective as to crimes committed after January 1, 1980, has made considerable change in the punishment prescribed for the various kinds of escapes, and perhaps commendable intelligence as to changes made by the new criminal code has encouraged defendant in his apparent belief that the judgment of conviction and sentence was not in conformity with the indictment and with the law applicable to the case against him.
One ground of the petition for writ of error coram nobis alleged that "during the whole trial, petitioner was compelled to wear prison clothing before a jury." Substantially the same ground is asserted as a basis for a reversal of the court's order denying the petition. During the hearing on the petition, and after there was evidence to the effect that defendant was wearing prison clothing, "blue denim clothing like a blue denim shirt with dark denim pants," the court stated:
 "Mr. Stokes, I can tell you this of my own personal knowledge about the prison clothes. Mr. Bill Law, the probation officer, told me that the Baptist Church had clothing that could be made available to Defendants in these cases. And I don't know what officer it was, but I told him to find out if Mr. Jacques wanted some clothes from down there and he said, no, he wanted to be tried in his prison clothes, is the word that came back to me about it. I made an effort to see that he got clothing other than the prison clothing."
The petitioner testified that he did not recall having any discussion with the court or his attorney with reference to his clothing and that he was not advised that he did not have to proceed to trial in the clothing that he had on. He said:
 "Q. Your testimony under oath is, that nobody ever told you that you had access to any other clothes?
"A. Yes, sir.
 "Q. And you sat through your trial in the clothes that you had issued to you in Kilby prison, is that right?
"A. Yes, sir."
In Estelle v. Williams, 425 U.S. 501, 96 S.Ct. 1691,48 L.Ed.2d 126 (1976), reh. den. 426 U.S. 954, 96 S.Ct. 3182,49 L.Ed.2d 1194 (1976), it was held that a state *Page 880 
cannot, consistent with the Fourteenth Amendment due process or equal protection requirements, compel an accused to stand trial before a jury while clothed in identifiable prison clothing, but that the failure to make an objection to the court as to being tried in such clothing, for whatever reason, was sufficient to negate the presence of compulsion necessary to establish a constitutional violation. The instant case presents an even more favorable situation for the application of that which was held in Estelle v. Williams, for the reason that all of the jurors knew from the evidence presented to them that defendant was at the time of his trial a convict, serving time at the time of the trial for a previous felony. His prison attire revealed nothing to the jury as to which the jury was not fully informed by the evidence. The defendant was not prejudiced by any failure on the part of the State to provide him with other clothes. In saying this, we do not recommend that even in such a case a convict should not be dressed with appropriate clothes throughout his trial, clothing distinctly different from his prison clothes. He should be if such is his desire, as apparently he would have been, except for some apparent or possible misunderstanding.
One of the grounds of the pro se petition for writ of error coram nobis states:
 "Petitioner was entitled to a court appointed attorney who would aid him and not the state, and an attorney who had an interest and not a conflict of interest. Three other codefendants only got 90 days for alleged escape, yet court appointed attorney wanted petitioner to plea bargain for thirty years. Court appointed attorney's wife, a lawyer also on the same case, had another codefendant testify against petitioner to get 90 days in jail."
On the hearing of the petition, the attorney appointed to represent defendant on the trial and who continued to represent him on appeal, as shown by Jacques v. State, supra, testified on call of the petitioner. Said attorney's wife, also an attorney, testified also on call of the petitioner. Their testimony is clear, and its credibility is not questioned. They are and were partners in the practice of the law. Each was appointed by the court as an attorney for an indigent defendant who was confined to the Covington County Jail on the night of November 1-2, 1978, when there was a "jailbreak" in which seven or more prisoners escaped. The husband was appointed to represent Mr. Jacques, and the wife was appointed to represent Mr. Bart T. Rossi. However, she was not appointed to represent Mr. Rossi on the charge of an escape. It appears that before she was appointed to represent him, the case against him for an escape had already been heard and disposed of as a misdemeanor in the District Court. She was appointed to represent Rossi first in a case against him for possession of marijuana and thereafter was appointed to represent him in a case based on a charge of larceny and robbery on the occasion or night of the jailbreak.
The testimony on the hearing of the petition, which consisted of the testimony of the two attorneys who had represented Mr. Jacques and Mr. Rossi, and the testimony of Mr. Jacques, was clear to the effect that both of the attorneys and Mr. Jacques knew that the husband was representing Mr. Jacques and the wife was representing Mr. Rossi. It is also clear from the testimony of Mr. Jacques and his attorney that the matter of the representation of Mr. Rossi by the attorney for Mr. Jacques was discussed between Mr. Jacques and his attorney, but neither was positive as to the reason for such discussion or as to any details thereof.
The undisputed evidence on the hearing on the petition shows also that Mr. Rossi's attorney through plea bargaining discussions with a representative of the State obtained an agreement from the prosecution for a judgment or judgments against Rossi, on his plea or pleas of guilty, which the court by its judgment or judgments approved. As to the plea bargaining discussions, the attorney for Mr. Rossi testified:
 "Q. Okay. Now, during your representation of him, was there some plea bargaining that went on in connection with *Page 881 
his getting a sentence in exchange for his cooperation in testifying in the Henry Jacques' trial?
 "A. He would get a recommendation in exchange for his cooperation in the escape and the charges arising therefrom.
". . . .
 "Q. Okay. So he agreed in effect, to cooperate with the State in the prosecutions arising, against anyone, arising out of the escape incident?
"A. As I remember, that's correct.
"Q. In which, Mr. Jacques was involved?
"A. In exchange for a recommendation, yes."
It is clear also that each of the attorneys represented his or her respective client independently and without cooperation or conjunction with the other attorney in his or her representation of his or her client. It appears that the only communication between them with reference to the subject was that she "told Mr. Jacques' attorney that Mr. Rossi was going to testify in the case against Mr. Jacques."
As a part of the testimony of Mr. Rossi's attorney on the hearing of the coram nobis petition, she said:
 "Q. Did you have any discussion with the District Attorney or the Court with reference to any possible conflicts that might arise from that situation?
"A. Yes, I did.
 "Q. Could you tell us the nature of those discussions and how that was resolved?
 "A. When I became aware that Mr. Rossi — that there was a possibility that he would become a State's witness, as I remember it, I spoke to the judge. And asked him about my husband representing one person involved in the escape and my representing another and was informed that they did not believe that there would be any conflict and that I would not withdraw."
Notwithstanding the good faith and sincerity and the then apparent propriety of one's law partner representing Mr. Jacques and the other law partner representing Mr. Rossi, with the sanction thereof by the court, there was danger lurking therein that doubtless could not have been as well perceived then as now. Facially, at least, a serious question is presented as to whether the situation described impaired Mr. Jacques' attorney, potentially or actually, in his ability or conduct in his representation of Mr. Jacques. Not all law partnerships possess the same community of interest and confidence in the business of the partnership. However, we have an example here of an admirable extraordinary community of interest among law partners that is hardly distinguishable from a complete unity of interest. If it is assumed that neither of the attorneys could have properly represented Jacques and Rossi, it seems to us that neither attorney should have represented either defendant while the other attorney was representing the other defendant. It cannot be maintained that an attorney cannot represent more than one of a number of codefendants, whether singly or jointly indicted. At the time of the appointment of the attorney to represent Jacques and the appointment of the attorney to represent Rossi, it is understandable that there was no apparent conflict of interest between that of Jacques and that of Rossi. However, when it developed that Rossi was to plea bargain on a basis of his cooperation with the State and testifying on call of the State, which he did not have to do by reason of his constitutional right not to incriminate himself, a conflict, in our opinion, occurred. The situation then became dangerously close to a collision with the result found in Zuck v. Alabama,588 F.2d 436 (5 Cir. 1979), in which it was stated at 588 F.2d 439:
 ". . . If a defense attorney owes duties to a party whose interests are adverse to those of the defendant, then an actual conflict exists. The interest of the other client and the defendant are sufficiently adverse if it is shown that the attorney owes a duty to the defendant to take some action that could be detrimental to his other client.
 "If such an actual conflict exists, it need not be shown that the divided loyalties actually prejudice the defendant in the *Page 882 
conduct of his trial. As we noted in Castillo [Castillo v. Estelle], 504 F.2d [1243] at 1245 [(5th Cir.)]:
 "`When there is a conflict of interest such as exists in this case, the prejudice may be subtle, even unconscious. It may elude detection or review. A reviewing court deals with a cold record, capable, perhaps, of exposing gross instances of incompetence but often giving no clue to the erosion of zeal which may ensue from divided loyalty. Accordingly, where the conflict is real, as it is here, a denial of the right to effective representation exists, without the showing of specific prejudice.'"
Whether we agree with the application of the principles of law set forth in Zuck to the facts, we are required, whether such is as it should be, to follow what federal courts consistently hold as to rights guaranteed by the Constitution of the United States, including the Fourteenth Amendment rights which have been construed to include the right to the effective assistance of counsel in the defense of a criminal case. We do not hesitate to follow that which was held in Zuck and stated in other federal cases. We find, however, that there are circumstances in the instant case not discussed above, which will be now discussed, that remove the judgment of conviction and sentence of Jacques from extinction as pronounced as to the trial court judgments in Zuck and other cases.
On the hearing of the coram nobis petition, there was introduced in evidence a copy of the transcript of the evidence on the trial of the case, and we have it now before us as a part of the transcript[2] on this appeal as it was in Zuck v.State, supra. By it we are reminded of the factual basis for what was said in Jacques v. State, at 376 So.2d 825, that before the trial commenced therein defendant moved the court to dismiss his attorney and that in overruling the motion, the trial court made it clear to the defendant that defendant presented to the court no good reason for the removal of the attorney, that the previous attorney had been appointed and had been removed on motion of the defendant. In Jacques v. State,supra, our opinion included a review of the trial court's action in denying defendant's motion to remove his attorney and in permitting, nevertheless, the defendant to participate pro se in the defense, which he did with commendable skill, irrespective of any lack of due deference to the trial judge and to his attorney. We concluded that there had been no error prejudicial to defendant, that there had been "no questionable ruling of the court that, if otherwise, would have caused a different verdict." There was no application for rehearing, no petition for certiorari. In presenting the motion to remove his attorney in the trial court, defendant filed a written pro se motion, consisting of nine paragraphs, the last paragraph stating:
 "9. It seems public defender spends more time talking to the district attorney; therefore, defendant asks the court to appoint him another attorney for public defender definitely has no interest and there certainly is a conflict of interest, for I need an attorney who will help me and not the district attorney."
Promptly after the court announced its ruling denying defendant's motion to dismiss his attorney, there was considerable dialogue between the court and defendant, but in it there was no mention made of the fact that the wife and partner of defendant's attorney was attorney for Bart Rossi. The motion was filed two days before the trial commenced, along with other pro se documents, including a "Request for Subpoena to Produce Witnesses at Trial." The request contained a list of fifty-seven named witnesses, which included as number 13 the name of Bart Rossi.
Although there is accentuation in the coram nobis proceeding of the representation of petitioner by the husband and law partner of the attorney who represented Rossi, *Page 883 
it appears that petitioner was fully cognizant of that fact when the case was tried and that he did not accentuate the fact when he presented his motion to remove his attorney. With his obvious familiarity with his Fourth Amendment rights, appellant should have so emphasized the conflict of interest question as to have brought it to the attention of the trial court and to the court on appeal, long before the filing of his coram nobis petition.
We now have occasion to look more intently upon the testimony of Bart Rossi on the trial of the case. He was the witness who testified that he saw defendant releasing the jailer from a "Full-Nelson hold." He was not cross-examined by defendant's attorney; Mr. Jacques cross-examined the witness. He was able to show by his own familiarity with the jail that were it not for light in a bathroom of the area where the witness said he saw defendant releasing the jailer from a "Full-Nelson hold" the area would have been "pitch black." A part of the cross-examination was as follows:
"Q. All right. Was there any lights on out here?
"A. No, it was very dark.
"Q. Was there any lights in the middle cell?
"A. No.
"Q. Was any lights on on the north side?
"A. No.
 "Q. In other words, the place — the whole top floor was pitch black?
"A. Right.
 "Q. But you seen me bring Melvin Watson inside in a Full-Nelson?
"A. Yes.
"Q. In pitch black darkness, you seen me?
"A. Right. There was a light on in the bathroom.
"Q. You just said all the lights were out upstairs?
 "A. They were except for the bathroom light. That light is always on.
"Q. Nobody in the cell can turn that light out?
"A. Not before you can go up there and unscrew it.
 "Q. Can anybody in the cell unscrew that light and put that light out?
"A. Yes.
"Q. And as far as you know all these doors was open?
"A. Right."
It should be said, we think, that, contrary to that which might otherwise be thought, Bart Rossi was not a convict at the time of the escape and therefore could not have been convicted under § 13-5-65, as was Mr. Jacques, or under § 13-5-63, which is applicable to the escape of one who has been convicted of a misdemeanor, and could only have been convicted under § 13-5-68. The violation of § 13-5-68 is a misdemeanor with a maximum prison sentence of six months. Whatever leniency he may have obtained by reason of his willingness to testify as a witness for the State against Mr. Jacques was not as great as Mr. Jacques seemed to think in emphasizing the disparity between the punishment received by Mr. Jacques and the punishment received by Rossi. We do not attempt to say whether the fact that Rossi was only eighteen years of age at the time was a material factor as to the punishment he received.
Although the conflict of interest issue was presented in the coram nobis proceeding, the cardinal grievance of petitioner was as to the question of the validity of his sentence of imprisonment for thirty years. According to what the petitioner said at the conclusion of his testimony on the hearing, the proceeding was based exclusively upon that grievance. His last words on the subject in his cross-examination were:
 "Q. Now, Mr. Jacques, at the time you were indicted and tried for escape, what was you in jail for?
 "A. I'd been — I was in jail for breaking and entering and grand larceny, I believe.
"Q. How many different cases?
"A. Four.
 "Q. Four different cases? All right. Did you escape from jail?
"A. I walked away from the jail. *Page 884 
 "Q. All right. You did leave the jail knowing you were sentenced — supposed to stay there, didn't you?
"A. Yes, sir.
 "Q. All right. Now what is it you are asking the Court to do here today?
 "A. I'm asking that I be tried and sentenced for what I am indicted for. I was not tried and sentenced for what I was indicted for. I was found guilty of escaping from a county jail and the sheriff and then I was sentenced to thirty years for escape from a penitentiary and a guard.
"Q. All right. And that's what you are asking for?
"MR. STOKES: I . . .
 "A. I'm just asking to be treated like anybody else got treated."
By his own testimony, appellant showed that he was guilty of the crime of escape, that he was rightfully convicted of a crime of escape, that he now has no genuine complaint as to the services of the attorney who represented him on the trial except that the attorney should not have endeavored to work out a plea bargaining disposition of his case on the basis that there was no valid charge against him for the more serious kind of an escape, and that his punishment should not have exceeded the maximum of the punishment prescribed for the escape committed by Rossi and some of the other escapees. His entire grievance was condensed into a mistaken notion as to the applicable law. It follows that he has presented no valid basis for post-conviction relief and that the trial court was not in error in denying his petition for writ of error coram nobis.
As we have already indicated, the notion of appellant that the section of the Code under which he was convicted, § 13-5-65, does not exclusively embrace an escape by one who has been convicted of a felony, and for that reason another section of the Code would have been applicable to his case, is a mistaken one. However, the mistake is one easily made and is not without some reason, when we consider the absence of express language that the convict therein stated must be one convicted of a felony. In addition to what has been determined herein that the language of § 13-5-65, containing the phrase "either within or outside the walls of the penitentiary," limited its application to persons who had been convicted of a felony and sentenced to the penitentiary, and that none of the other sections of the Code would have been applicable to such convicts whose sentences had not expired, we call special attention to the true meaning of "convict" when used as a noun.
This portion of the opinion is largely out of special consideration and respect for that which appears to be a persistent and sincere belief of appellant in the correctness of his construction of the law, as to which he has recently been an avid and resourceful student. We can readily see that in the language and terminology of the present time the noun "convict" is often used and understood as referable to one who has not been convicted of a felony and sentenced to the penitentiary, but, to avoid a misunderstanding, it is well to note that the word has a special signification in addition to its general meaning, which is thus well expressed:
 "1. A person proved guilty, by a competent tribunal, of a criminal offense; esp., a person convicted of, and under sentence for, a felony or serious crime.
 "2. Hence, in popular use, a person serving a prison sentence, usually for a long term." Webster's New International Dictionary (2d. ed.)
No doubt the special meaning of the word was more generally ascribed to it in the distant past than was its general meaning, particularly in 1852, when the law contained in § 13-5-65 was first codified. In striking contrast, the statutory authority for § 13-5-63, applicable to convicts sentenced to imprisonment in the county jail or to hard labor for the county, is found in Acts 1959, No. 87, p. 508.
It is to be noted that his attorney appointed by the court to represent him in his coram nobis proceeding, who has also represented him on appeal and has filed a brief *Page 885 
in his behalf, filed a motion in this court on January 9, 1981, that he be allowed to withdraw as counsel for appellant by reason of the fact that on January 20, 1981, he would become an "Assistant District Attorney for Covington County, Alabama," which would create a conflict of interest. The motion was granted by the Presiding Judge of this Court on the same day it was filed. Thereafter, appellant filed a motion for the appointment of counsel on appeal, in the light of the conflict of interest of his own attorney on this appeal. By letter of February 5, 1981, the Clerk of this Court advised appellant that she had been instructed to inform him that his appeal in this case had been submitted on the brief of his former attorney and that "Should your appeal be affirmed, the Court of Criminal Appeals will appoint an attorney for you for application for rehearing." This is to be promptly done so as to give the newly appointed attorney an opportunity to file an application for rehearing and a supporting brief.
It is to be further noted, perhaps interestingly, that in requesting a particular attorney, naming him, appellant says that he "is a competent attorney and is very familiar with this for he is already representing a codefendant on his appeal connected with this same case." All of this is to be kept in mind and special consideration given to any question of "conflict of interest."
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court. The judgment of the trial court is hereby
AFFIRMED.
All the Judges concur.
[1] The attorney does not now represent appellant, as explained in the concluding part of the opinion.
[2] It is a photocopy, which complies with the Rules, but it is a dim copy, which does not comply with the spirit of the Rules, and we have been able with considerable strain to read it.